1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

YUSSUF ABDULLE,

8                                          Petitioner,          Case No. 2:19-cv-00037-MJP-BAT

9          v.                                                   **REPORT AND**
                                                                **RECOMMENDATION**
10     JEFFREY A. UTTECHT,

11                                         Respondent.

12

13          Petitioner Yussuf Abdulle[1] was convicted by a jury of two counts of Promoting

14     Commercial Sexual Abuse of a Minor. He was sentenced to 189 months imprisonment. The

15     convictions involved two then-minor girls, AP and BI. Mr. Abdulle seeks 28 U.S.C. § 2254

16     habeas relief as to Count 2 only (involving BI). Dkt. 13 (Amended Habeas Petition).

17          The Amended Habeas Petition presents one ground for habeas relief, that "[t]here was

18     insufficient properly admitted evidence of [his] guilt, in part due to ineffective assistance of

19     counsel" [hereinafter "IAC"]. *Id.* at 8. Mr. Abdulle contends his trial counsel was ineffective

20     because he (1) failed to object to hearsay statements (unsworn statements made by BI during an

21     out-of-court interview with a police detective); and (2) failed to explain that Mr. Abdulle had

22     standing to testify at a pre-trial motion to suppress hearing. *Id.*, pp. 8-10. Mr. Abdulle has

23

---

[1] As established at trial, petitioner is also known as "Derrick."

REPORT AND RECOMMENDATION- 1

1  withdrawn the second portion of his IAC claim. Dkt. 24, p. 30.

2    The essence of the sole remaining IAC claim is that when BI initially testified, she

3  provided minimal evidence to support the elements of the charged offense. When it became clear

4  that the prosecutor was going to use the transcript of BI's interview with Detective Washington

5  to question BI, counsel failed to object on the grounds of hearsay and failed to request an

6  instruction that such testimony could not be considered as substantive evidence of guilt. Mr.

7  Abdulle contends this failure resulted in the admission of substantive evidence of guilt that

8  otherwise would not have been admitted and that it is reasonably probable that the verdict on

9  Count 2 would have been different had counsel acted effectively. Dkt. 24, 16-17.

10    Respondent contends to the extent Mr. Abdulle is attempting to incorporate new subparts

11  to his original sufficiency of the evidence claim or an entirely new IAC claim, that claim is time-

12  barred, unexhausted, and does not relate back to his original habeas petition. Respondent also

13  argues the new IAC claim is without merit as any objection by counsel would have been

14  overruled and, even if counsel should have objected, Mr. Abdulle cannot show that he was

15  prejudiced by this failure.

16    Although the parties disagree on the calculation of the running of the statute of

17  limitations, Mr. Abdulle acknowledges his Amended Petition was filed outside the statute of

18  limitations but, he argues that his IAC claim relates back to the claims raised in his original

19  habeas petition (or alternatively, that he is entitled to equitable tolling). Mr. Abdulle also

20  acknowledges his IAC claim is unexhausted and procedurally defaulted because it was never

21  raised in state court (Dkt. 24, p. 4) but, he argues that his procedural default is excused under

22  *Martinez v. Ryan,* 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).

23

REPORT AND RECOMMENDATION- 2

1   The undersigned concludes the IAC claim may be reviewed on the merits because the

2   procedural default is excused under *Martinez* and the claim is timely because it relates back to

3   the claims raised in the original habeas petition. Under these circumstances, the undersigned has

4   reviewed the IAC claim *de novo* and concludes counsel's performance did not fall below an

5   objective standard of reasonableness but if it did, any such deficiency did not result in prejudice.

6   Accordingly, the undersigned recommends that the habeas petition be denied.

7   If the assigned District Judge disagrees that the merits of the IAC claim should be

8   reached, the undersigned recommends the holding of an evidentiary hearing because a colorable

9   claim that the procedural default should be excused under *Martinez* has been made. (Section

10  2254(e)(2) does not bar evidentiary hearings either to show "cause" under *Martinez* or to

11  establish the underlying IAC claim). *See e.g.*, *Ramirez v. Ryan*, 937 F.3d 1230, 1248 (9th Cir.

12  2019). The undersigned further recommends issuance of a certificate of appealability.

13                          <u>BACKGROUND</u>

14  A.   <u>Statement of Facts</u>

15  The Washington Court of Appeals summarized the facts in its opinion on direct

16  appeal:

17
> BI was born in July 1996. She began prostituting when she was 15 years old. Soon after, she left her family and began living with friends. In February
18
> 2013, BI moved in with Yussuf Abdulle, who went by the name "Derrick." BI asked Abdulle if her acquaintance, AP, could also stay with them because she had
19
> nowhere else to live. Like BI, AP was born in July 1996 and had left her family as a teenager. She began prostituting in 2013. Abdulle agreed to allow AP to stay
20
> with him and BI. He drove to a mutual friend's house to pick up AP and BI the next day.
21
22
> Abdulle introduced himself to AP as "Derrick." Abdulle told AP he would get her dates – or "jugs"-in exchange for a percentage of what she earned
> prostituting:
23

REPORT AND RECOMMENDATION- 3

[Abdulle asked] if I [AP] know what I'm doing, like going out
here and making these jugs and if I'm really going to give him the
cut, and I'm not going to – and I'm not going to – he's not going
to put me on with a jug and then I run off, stuff like that.

AP testified that she was "fine" with the arrangement because Abdulle
was giving her a place to stay and "he wouldn't even really ask for a lot" of what
she earned. She said that if she earned $100 dollars from prostituting, Abdulle
would usually get $40.

When AP first moved in, Abdulle wanted BI to take some pictures of her
and then he told AP "he was going to call some of the jugs [and] get things going
from there." Abdulle set up six dates for AP. Abdulle arranged the dates, set the
price, and typically drove AP to and from the dates. AP received $120-$130 for
each date and would split the money with Abdulle afterward. BI claimed she
worked independently, arranged her own dates, kept her earnings, and never paid
rent to Abdulle. Abdulle did provide BI with transportation to and from dates
"one or two times." AP testified that BI and Abdulle argued about money. She
said that BI "didn't really want to give him enough money to stay" in the
apartment. BI eventually left the apartment due to her financial disputes with
Abdulle. Before she left the apartment, BI gave Abdulle a cell phone and about
$100 dollars in case she had earned prostituting.

. . . .

AP's mother contacted the police after learning the details of AP's
experience and finding a message on her phone from "Derrick" asking AP to call
him back. On April 11, 2013, AP met with Detective Maurice Washington. AP
disclosed to Det. Washington that she and BI had been prostituted by Abdulle.
AP went with Det. Washington to identify the apartment she had lived in with
Abdulle. She also identified two vehicles parked outside the apartment she
believed belonged to Abdulle. Det. Washington took AP's cell phone for forensic
examination. He later used a universal forensic examination device to extract data
from AP's cell phone.

Det. Washington then located photos of BI through social media and
contacted her. BI agreed to cooperate with Det. Washington's investigation. She
corroborated many of the details AP had provided to Det. Washington. BI knew
the address of the apartment she had lived in with AP and Abdulle. BI went to
the location with Det. Washington, where she pointed out the building and the
specific unit of Abdulle's apartment. She also identified the same two vehicles
that AP had identified as belonging to Abdulle. BI provided her cell phone to Det.
Washington who examined it using the forensic device. Later in the investigation,
BI identified Abdulle as "Derrick" in a photo montage.

REPORT AND RECOMMENDATION- 4

Det. Washington reviewed the results of the reports from the forensic device on both AP's and BI's phones. He discovered a number in both phones that he suspected belonged to Abdulle. AP confirmed this number belonged to "Derrick" and BI had the same number stored in her phone. AP's phone received a text message from this number requesting to meet.

On May 6, 2013, Det. Washington, using AP's phone, posed as AP and arranged a meeting with "Derrick" via text message. Det. Washington brought AP to the meeting location. AP positively identified "Derrick" driving a white Toyota. Officers approached the car, ordered "Derrick" out, and arrested him. After arresting "Derrick," officers discovered a cell phone he had dropped on the ground.

Det. Washington requested and obtained search warrants for Abdulle's apartment and vehicles. A search of one of the vehicles yielded an auto insurance policy for "Yussuf Abdulle" and a yellow receipt with the name "Derrick." Det. Washington took photos of "Derrick" following his arrest, and BI immediately identified him from those photographs.

…[D]et. Washington manually retrieved cell phone information by systematically photographing the cell phone's entire phone call history, text message history, and contact list. He also called the number for "Derrick" he received from AP's phone, and the cell phone recovered from Abdulle began ringing. While searching Abdulle's home, he discovered AP's number stored in the contact list under the name "Emily." Det. Washington noted several calls and text messages to and from AP's number on Abdulle's phone, some occurring on the day of his arrest. Det. Washington recognized some of the messages on Abdulle's phone as those AP had received prior to the arrest.

Det. Washington also used a universal forensic examination device to analyze a second cell phone recovered from Abdulle's white Toyota. On the second cell phone, Det. Washington discovered 10 to 12 text messages exchanged with AP's phone and 6 to 8 messages exchanged with BI's phone. He found one text exchange from February 19, 2013, where Abdulle told a potential client that he had a "girl" who looked young and would be turning 18 in July. This corroborated BI's testimony that she told Abdulle she would turn 18 in July that year.

. . . .

Cell Phone Testimony

. . . .

Det. Washington performed a full extraction from AP's phone but only a partial extraction of BI's phone. A portion of the report from AP's phone

containing text messages from the number associated with Abdulle was admitted. Only a portion of BI's "contacts" list containing the same number identified as "answer don't" was admitted. The report of Abdulle's phone containing messages exchanged with AP and BI was admitted.

The jury convicted Abdulle on two counts of promoting commercial sex abuse of a minor. The jury acquitted him of the unlawful imprisonment and assault counts.

Dkt. 19, Exhibit 2, at 2-9.

B.    State Procedural History

1.    Direct Appeal

Mr. Abdulle appealed to the Washington Court of Appeals. Dkt. 19, Ex. 3-5. Appellate counsel presented two assignments of error: (1) expert testimony was irrelevant, unhelpful, prejudicial and should have been excluded and (2) the state failed to show the method used to extract data from cell phones was reliable and accurate and the detective's testimony regarding the contents of the reports should not have been admitted. Exhibit 3, at i. On April 25, 2016, the Court of Appeals affirmed, concluding the trial court did not err in finding the expert's testimony helpful because it provided context for the evidence presented that Mr. Abdulle had an "agreement or understanding with AP and BI" and the state made a sufficient showing of "authenticity" under ER 901(a) for admission of the data. *Id.*, Ex. 2 at 11-13. The court also denied on the merits the various issues raised by Mr. Abdulle in his pro se statement of additional grounds. *Id.*, Ex. 2 at 14-18.

Mr. Abdulle filed a motion for reconsideration which was denied on June 10, 2016. *Id.*, Ex. 6 (motion); Ex. 7 (order). Pro se, Mr. Abdulle sought discretionary review by the Washington Supreme Court. Dkt. 19, Ex. 8. On November 2, 2016, the Supreme Court denied review without comment. *Id.*, Ex. 9. The Court of Appeals issued its mandate on December 9, 2016. *Id.*, Ex. 10.

REPORT AND RECOMMENDATION- 6

1          2.    Personal Restraint Petition

2          Mr. Abdulle filed his *pro se* personal restraint petition on April 4, 2017, raising two

3    grounds for relief: (1) court appointed counsel's failure to move for suppression of text messages

4    and evidence extracted from a warrantless search of a cell phone was unreasonable, effectively

5    denying him effective assistance of counsel and (2) there was insufficient evidence that he

6    contributed to the sexual abuse of BI or that any sexual activities occurred. Dkt. 19, Ex. 11 at 2.

7    On November 21, 2017, the chief judge of the Court of Appeals rejected the claims and

8    dismissed the petition. *Id.*, Ex. 14.

9          Mr. Abdulle filed a motion for discretionary review raising three issues: (1) the appellate

10   court erred in finding counsel was not ineffective for failing to move for suppression of the text

11   messages and extracted data, (2) the court of appeals erred in finding evidence that petitioner

12   contributed to the sexual abuse of BI or that sexual activities occurred, and (3) the court of

13   appeals erred by allowing the State to "refuse" to include a copy of "parts of the records which

14   are relevant." Dkt. 19, Ex. 15. On July 11, 2018, the Supreme Court Commissioner denied

15   review without comment. *Id.*, Ex. 16. The Court of Appeals issued a certificate of finality on

16   August 24, 2018. *Id.*, Ex. 17.

17                                    STANDARDS OF REVIEW

18         Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), factual

19   determinations made by the state courts are presumed to be correct, and the habeas petitioner

20   bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."

21   28 U.S.C. § 2254(e)(1). The Court may grant habeas relief on a claim adjudicated on the merits

22   in state court only if the state-court decision "was contrary to, or involved an unreasonable

23   application of, clearly established Federal law, as determined by the Supreme Court of the

REPORT AND RECOMMENDATION- 7

United States," 28 U.S.C. § 2254(d)(1), or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

Any federally reviewable claims that were not adjudicated on the merits in state court are reviewed *de novo*. *Runningeagle v. Ryan*, 825 F.3d 970, 978 (9th Cir. 2016).

<u>DISCUSSION</u>

A.    <u>Statute of Limitations</u>

AEDPA established a statute of limitations for habeas corpus petitions filed by prisoners challenging their custody under a state court judgment and sentence. 28 U.S.C. § 2244(d). Where the challenged judgment became final after April 24, 1996, the statute generally begins to run from "(A) the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). For the purposes of 28 U.S.C. § 2244(d)(1)(A), direct review usually concludes either upon the expiration of the time for filing a petition for writ of certiorari with the Supreme Court, or when the Court rules on a timely filed petition for certiorari. *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999).

The Washington Supreme Court denied review in the direct appeal on November 2, 2016. Dkt. 19, Ex. 9. Mr. Abdulle had ninety days from that date to file a petition for writ of certiorari. Sup. Ct. R. 13. Mr. Abdulle did not file a petition for writ of certiorari with the Supreme Court, and the time for seeking certiorari expired ninety days later, on January 31, 2017. The direct review process ended on January 31, 2017, the judgment became final for purposes of the statute of limitations on that date, and the finality of the judgment triggered the statute of limitations. 28 U.S.C. § 2244(d)(1)(A); *Corjasso v. Ayers*, 278 F.3d 874, 877 (9th Cir. 2002).

REPORT AND RECOMMENDATION- 8

1    Thus, the statute of limitations started to run on January 31, 2017 and continued to run for

2    63 days until Mr. Abdulle filed a state court collateral challenge on April 4, 2017. At that time,

3    the limitations period began to toll under 28 U.S.C. § 2244(d)(2). The statute of limitations tolled

4    while the petition remained pending in state court until August 24, 2018, when the Washington

5    Court of Appeals issued a certificate of finality. Dkt. 19, Ex. 17. The statute of limitations then

6    continued to run again and ran for an additional 302 days until it expired on June 22, 2019.

7    The parties disagree on whether the statute of limitations starts to run again when the

8    Washington Supreme Court denies review or when the certificate of finality is issued. The date

9    that a petitioner's state PRP becomes final for the purposes of 28 U.S.C Section 2254(d) is a

10   question of state law. *See Carey v. Saffold*, 536 U.S. 214, 214 (2002). The Ninth Circuit recently

11   certified a question to the Washington Supreme Court, asking whether the date of the

12   Washington State Supreme Court's denial of review, or the date stated on the Washington Court

13   of Appeal's certificate of finality is the date that ends statutory tolling. *See Phonsavanh*

14   *Phongmanivan v. Haynes*, 2019 WL 1285260, slip op. at 1 (9th Cir. 2019).

15   Mr. Abdulle filed his original habeas corpus petition on January 18, 2019, which is

16   within the statute of limitations under either calculation. Dkt. 4. While the original petition was

17   timely, its filing did not toll the statute of limitations. *Duncan v. Walker*, 533 U.S. 167, 181-82

18   (2001). The statute of limitations continued to run after the original petition was filed and

19   expired on June 22, 2019 (or May 9, 2019 by the State's calculation). Mr. Abdulle did not file his

20   Amended Petition until July 3, 2019, well after the statute of limitations had expired under either

21   calculation.

22   Mr. Abdulle does not dispute that the Amended Petition was filed outside the statute of

23   limitations but contends his Amended Petition is not barred from consideration because the claim

REPORT AND RECOMMENDATION- 9

1    relates back to the claims in his original petition and if it does not relate back, the period between

2    March 18, 2019 and July 3, 2019 was equitably tolled. The State contends that an allegation of

3    pure insufficiency of evidence would relate back (Dkt. 18 at 14-17), but the IAC claim does not.

4    The original habeas petition contained two grounds for relief: (1) IAC due to counsel's failure to

5    move for suppression of text messages and evidence of warrantless search of cell phone; and (2)

6    no evidence that petitioner contributed to sex abuse of [BI] or that any sexual activities occurred.

7    Dkt. 4 at 6.

8        Rule 15 of the Federal Rules of Civil Procedure, which governs amended pleadings, is

9    applicable to habeas proceedings under 28 U.S.C. § 2254. *See Mayle v. Felix*, 545 U.S. 644, 655

10   (2005). Under Rule 15(c)(2), generally, an amended habeas petition may relate back to the date

11   when the original petition was filed. *Id*. However, a prisoner cannot "assert a claim otherwise

12   barred by the statute of limitations merely because he asserted a separate claim within the

13   limitations period." *Id*. at 662 (citation omitted). The exception to this is if the original and

14   amended petitions state claims that are tied to a common core of operative facts. *Id*. at 664.

15       A claim will not relate back "when the new claims depend upon events separate in 'both

16   time and type'" from the original relief requested. *Id*. at 657, 125 S. Ct. 2562. This "time and

17   type" language "refers not to the claims, or grounds for relief. Rather, it refers to the facts that

18   support those grounds." *Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1297 (9th Cir. 2013)

19   *abrogated on other grounds by Davila v. Davis*, ––– U.S. ––––, 137 S. Ct. 2058, 198 L.Ed.2d

20   603 (2017).

21       Where a petition alleges a substantive violation of rights, and the amended petition

22   alleges IAC pertaining to that substantive violation (or *vice versa*), the IAC involves the same

23   common core of operative facts. For example, in *Nguyen*, where petitioner originally raised a

double jeopardy claim and his amended petition alleged IAC of appellate counsel for failing to rise a double jeopardy claim on appeal, the Ninth Circuit held that the new IAC claim related back to the substantive claim. *Id*. at 1297.

Here, the claim of insufficiency of evidence and the IAC claim share a "common core of operative facts" similar in "time and type," *i.e.*, when one excludes the hearsay testimony which was admitted as substantive evidence due to counsel's ineffectiveness, the remaining evidence was so slight, there is a reasonable probability the jury would have reached a different result as to Count 2. *See Ramirez v. Ryan*, 937 F.3d 1230, 1252 (9th Cir. 2019). As noted by the dissent in *Ramirez*, the holding of *Schneider v. McDaniel*, 674 F.3d 1144 (9th Cir. 2012) is inapposite to the situation presented here. In *Schneider*, the petitioner argued that his new IAC claim related back to a previous but different IAC, because of the common fact of counsel's ineffectiveness. *Id*. at 1151. In other words, the substantive part of the two claims is that counsel was ineffective. Here, the new IAC claim relates back to a substantive claim, not another and entirely different IAC claim.

Accordingly, the undersigned concludes that the IAC claim relates back to the filing of his original habeas petition and that it is therefore, timely.

### 2. Equitable Tolling

Mr. Abdulle argues that if his amended petition does not relate back to the filing of his original petition, he is nevertheless entitled to equitable tolling.

Beyond statutory tolling, federal habeas petitioners may also be entitled to equitable tolling of the statute of limitations. *Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 2560, 177 L.Ed.2d 130 (2010) ("§ 2244(d) is subject to equitable tolling in appropriate cases"); *Ford v. Gonzales*, 683 F.3d 1230, 1237 (9th Cir.), *cert. denied*, 568 U.S. 1053, 133 S.Ct. 769, 184

L.Ed.2d 508 (2012). "[A] petitioner is entitled to equitable tolling only if he shows (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." *Ford*, 683 F.3d at 1237 (quoting *Holland*, 130 S.Ct. at 2562) (internal quotation marks omitted). "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Id*. (quoting *Holland*, 130 S.Ct. at 2565) (internal quotation marks omitted). "[T]he requirement that extraordinary circumstances 'stood in his way' suggests that an external force must cause the untimeliness, rather than, as we have said, merely 'oversight, miscalculation or negligence on [the petitioner's] part, all of which would preclude the application of equitable tolling.'" *Waldron–Ramsey v. Pacholke*, 556 F.3d 1008, 1011 (9th Cir.2009) (quoting *Harris v. Carter*, 515 F.3d 1051, 1055 (9th Cir.2008)).

Nonetheless, "[g]rounds for equitable tolling under § 2244(d) are 'highly fact-dependent.'" *Laws v. Lamarque*, 351 F.3d 919, 922 (9th Cir. 2003) (quoting *Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir.2000) (en banc) (per curiam)); *see also Doe v. Busby*, 661 F.3d 1001, 1011 (9th Cir.2011) ("[l]ike any equitable consideration, whether a prisoner is entitled to equitable tolling under AEDPA will depend on a fact-specific inquiry by the habeas court which may be guided by 'decisions made in other similar cases'" (quoting *Holland*, 130 S.Ct. at 2563)).

On January 9, 2019, Mr. Abdulle, proceeding *pro se*, filed his original habeas petition and a motion for leave to proceed *in forma pauperis*. Dkt. 1. On January 18, 2019, the Court appointed the Federal Public Defender and directed that the State file an answer to the petition within 63 days. Dkt. 5. On March 15, 2019, the parties proposed by stipulation that by June 15, 2019, Mr. Abdulle should either file an amended petition or determine that he would not do so. Dkt. 9. The Court issued an order consistent with the parties' stipulation on March 18, 2019. Dkt.

10. On May 23, 2019, the parties stipulated to extending the deadline to either file an amended petition or determine that none would be filed, until July 30, 2019. Dkt. 11. On May 29, 2019, the Court issued an order consistent with the parties' stipulation. Dkt. 12. The amended petition was filed on July 3, 2019, well before the date ordered by the Court.

"Where a petitioner was affirmatively misled to believe that her limitations period was being tolled under the statute, this inaccuracy could entitle her to equitable tolling." *Rudin v. Myles*, 781 F.3d 1043, 1058 (9th Cir. 2015), *cert. denied sub nom*, *Gentry v. Rudin*, 136 S. Ct. 1157 (2016) (citing *Sossa v. Diaz*, 729 F.3d 1225, 1232–35 (9th Cir. 2013)). In *Sossa*, the Ninth Circuit held that the petitioner was entitled to equitable tolling because the magistrate judge affirmatively misled the petitioner by granting a motion for an extension of time. *Id*. at 1232–33 ("No litigant, pro se or otherwise, asks for an extension of time to file an untimely petition.").

As explained by the Ninth Circuit, all judges need do is "includ[e] in the order a disclaimer 'that by granting the ... extension, the court was making no finding or representation that the petition was not subject to dismissal as untimely.'" *Id*. at 1235 (ellipsis in *Sossa*). This "added clarification," the Ninth Circuit noted, "would place no additional burden on the district courts and would eliminate a petitioner's otherwise valid reliance on the court's extension of time." *Id*. In addition, it is the "State's responsibility to object to an extension of time beyond the statutory deadline if it intends to seek dismissal of the petition as untimely." *Id*.; *see also*, *Duarte v. Williams*, 2016 WL 4473415 at *3 (D. Nev. Aug. 23, 2016) (granting equitable tolling under *Sossa*); *Abelar v. Miller*, 2016 WL 4775463 at *4 (C.D. Cal. June 13, 2016), report and recommendation adopted in 2016 WL 4771387 (C.D. Cal. Sept. 13, 2016) (same).

Here, the State did not object to the extensions but affirmatively stipulated to them. In granting the extensions based on the parties' stipulations, the Court made no finding or

REPORT AND RECOMMENDATION- 13

1   representation "that the petition was not subject to dismissal as untimely." Under these

2   circumstances, the undersigned concludes that Mr. Abdulle is entitled to equitable tolling from

3   March 18, 2019, when the Court first authorized an extension past the date on which the statute

4   of limitations expired, until July 30, 2019, the final date for filing encompassed by the Court's

5   two extension orders.

6   B.    Exhaustion - Procedural Default

7          Mr. Abdulle acknowledges that he did not raise IAC claim at issue in the state courts and

8   thus, it is unexhausted and procedurally defaulted. Dkt. 24, p. 4 (only IAC claim raised in state

9   court related to the failure to file a motion to suppress). He argues that the procedural default is

10  excused under *Martinez v. Ryan*, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).

11         "Where, under state law, claims of ineffective assistance of trial counsel must be raised in

12  an initial-review collateral proceeding, a procedural default will not bar a federal habeas court

13  from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral

14  proceeding, there was no counsel or counsel in the proceeding was ineffective." *Martinez*, 132

15  S.Ct. at 1320. To establish "cause" for a procedural default under *Martinez*, a petitioner must

16  show that "(1) the underlying ineffective assistance of trial counsel claim is 'substantial'; (2) the

17  petitioner was not represented ... during the post-conviction relief ("PCR") proceeding; (3) the

18  state PCR proceeding was the initial review proceeding; and (4) state law required ... the

19  petitioner to bring the claim in the initial review collateral proceeding." *Dickens v. Ryan*, 740

20  F.3d 1302, 1319 (9th Cir. 2016).

21         1.    First Prong – Substantiality of IAC Claim

22         To satisfy the first prong of *Martinez*, "a prisoner must ... demonstrate that the underlying

23  ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner

REPORT AND RECOMMENDATION- 14

must demonstrate that the claim has some merit." *Martinez*, 132 S.Ct. at 1318. "An IAC claim has merit where (1) counsel's 'performance was unreasonable under prevailing professional standards,' and (2) 'there is a reasonable probability that but for counsel's unprofessional errors, the result would have been different.'" *Cook v. Ryan*, 688 F.3d 598, 610 (9th Cir. 2012) (internal citation omitted). "Substantiality" requires a petitioner to demonstrate that "reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir.2013) (internal citation omitted).

Thus, without passing judgment on the merits of the IAC claim, the Court must first determine whether Mr. Abdulle has satisfied the *Martinez* standard for "substantiality" and the undersigned concludes that he has satisfied this standard. A trial counsel's failure to object to evidence which is inadmissible under state law can constitute deficient performance under *Strickland v. Washington,* 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). *See Rupe v. Wood*, 93 F.3d 1434, 1444–45 (9th Cir.1996). The declaration of Mr. Abdulle's trial counsel, Walter Peale, is instructive on this issue:

> 2.     "At one point during the testimony of [BI], the prosecutor sought to elicit testimony regarding prior statements she had made to Detective Washington. RP 642. I raised an objection regarding her Fifth Amendment rights. However, I did not raise an objection that this evidence should be admissible only to impeach her, and that the jury should have been instructed that it could not be considered as substantive evidence of the crimes.
>
> 3.     I do not recall my state of mind at the time that I did not raise that objection, specifically whether I had a tactical reason for not doing so or instead simply failed to think of raising the objection.
>
> 4.     I was aware that [BI] had made statements to Detective Washington that were far more inculpatory than what she had testified to. In her direct testimony, she had not testified about providing Mr. Abdulle with any funds. She had testified that he did not set up any "dates" for her; the only arguable connection between Mr. Abdulle and her acts of prostitution in her testimony was that he

REPORT AND RECOMMENDATION- 15

gave her one phone number and said she should call it and "see what goes." *This testimony, standing alone, would have created a quite weak case for the State on Count 2 and even created a strong argument that her testimony did not establish a prima facie case to support that Count.*

5.    In contrast, she had told Detective Washington that she had given Mr. Abdulle cash and a cell phone (which he had sold and kept the cash from). She had also told Detective Washington that Mr. Abdulle had set up all of her "dates" and "used his cell phone to make calls and receive calls from customers that wanted to her sex with her for money." She had told him that she had sex for money with people arranged by Mr. Abdulle "several times" and that Mr. Abdulle transported her to and from her dates.

6.    The only tactical reason I can conceive of now that I might have had for not objecting was to avoid emphasizing to the jury the testimony that would be forthcoming. However, I could have raised that objection outside the presence of the jury, since the jury was not present when the Court denied my motion to have [BI] appointed counsel due to Fifth Amendment exposure, so I could have raised this hearsay objection at that time. In addition, my approach in this trial had generally been to try to limit the State's case, even where that required objections in the jury's presence or an instruction to the jury from the Court about disregarding or limiting the consideration of testimony.

Dkt. 13-4, Ex. 3, Declaration of Walter Peale (emphases added).[2]

Hearsay evidence is evidence of a statement that was made other than by a witness while testifying at the hearing that is offered to prove the truth of the matter stated. FRE 801; ER 80l. Out-of-court statements are inherently unreliable because "[t]he declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener." *See Williamson v. U.S.*, 512 U.S. 594, 598, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Hearsay is inadmissible unless an exception applies.

---

[2] Although review under 28 U.S.C. § 2254(d)(1) is limited to the state-court record, that evidentiary limitation, and § 2254(d) itself, "applies only to claims previously 'adjudicated on the merits in State court proceedings.'" *Dickens*, 740 F.3d at 1320 (quoting 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 186, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011)). Thus, the Court may consider Mr. Peale's declaration in determining the substantiality of the IAC claim.

REPORT AND RECOMMENDATION- 16

1    It is not disputed that BI's out-of-court statements to Detective Washington are hearsay.

2 Mr. Abdulle argues his counsel was ineffective for failing to object that this evidence could be

3 used only for impeachment and that counsel should have asked the Court to instruct the jury that

4 the evidence could not be considered as substantive evidence of the crime. According to Mr.

5 Peale, there was no tactical advantage in failing to raise this objection because BI's direct

6 testimony prior to the admission of the hearsay created a strong argument that her testimony did

7 not establish a prima facie case to establish the elements of Count 2 (*i.e.*, that Mr. Abdulle had

8 "knowingly advance[d] commercial sexual abuse or a sexually explicit act of a minor or

9 profit[ted] from a minor engaged in sexual conduct or a sexually explicit act." RCW

10 9.68A.101(1) (2013)).

11    Accordingly, without passing on the merits of the IAC claim, the Court finds that

12 "reasonable jurists could debate" whether petitioner's trial-counsel performed deficiently when

13 he failed to object to the admission of hearsay evidence. Additionally, the Court finds that

14 "reasonable jurists could debate" whether the "decision reached would reasonably likely have

15 been different absent the errors," *i.e.*, whether the jury would have found him guilty of Count 2

16 as the State would not have been able to rely on what BI told Detective Washington to establish

17 the elements of Count 2. Mr. Abdulle therefore satisfies the *Martinez* "substantial" prong.

18    2.    <u>Second Prong – Representation</u>

19    It is undisputed that Mr. Abdulle was unrepresented when he collaterally attacked his

20 conviction. Thus, he satisfies the second prong of *Martinez*.

21    3.    <u>Third and Fourth Prongs – When IAC Claim Can Be Raised</u>

22    In Washington state, claims of IAC must normally be raised through a collateral attack.

23 *See Woods v. Sinclair*, 764 F.3d 1109, 1137 (9th Cir. 2014) (Washington is a state where

REPORT AND RECOMMENDATION- 17

1  ineffective assistance of counsel, as a practical matter, must be brought during postconviction

2  proceedings, meeting third and fourth *Martinez* criteria). Therefore, Mr. Abdulle has satisfied the

3  third and fourth prongs of *Martinez*.

4       "A petitioner who was not represented by post-conviction counsel in his initial-review

5  collateral proceeding is not required to make any additional showing of prejudice over and above

6  the requirement of showing a substantial trial-level [ineffective assistance] claim." *Rodney v.*

7  *Filson*, 916 F.3d 1254 at 1260 n. 2 (2019) (citing *Detrich v. Ryan*, 740 F.3d 1237, 1245–46 (9th

8  Cir. 2013) (en banc)). As discussed above, the undersigned finds that the IAC claim is

9  substantial, thereby demonstrating *Coleman* "prejudice" as defined by the Ninth Circuit; and, the

10  procedural default should, therefore be excused.

11  C.    IAC Claim

12       1.    Standard of Review

13       If the Court agrees that the IAC claim is substantial and thus that the procedural default

14  of the claim is excused under *Martinez*, then AEDPA deference no longer applies and the claim

15  is subject to *de novo* review. *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

16       2.    Need for Evidentiary Hearing

17       "In deciding whether to grant an evidentiary hearing, a federal court must consider

18  whether such a hearing could enable an applicant to prove the petition's factual allegations,

19  which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550

20  U.S. 465, 474 (2007).

21       The right to an evidentiary hearing applies to the actual merits of the underlying claim of

22  IAC by trial counsel, where that claim was defaulted but the default is excused under *Martinez*.

23  *See Detrich v. Ryan*, 740 F.3d 1237, 1247 (9th Cir. 2013) (Section 2254(e)(2) does not bar

REPORT AND RECOMMENDATION- 18

1    evidentiary hearings either to show "cause" under *Martinez* or to establish the underlying IAC

2    claim); *Dickens*, 740 F.3d 1302 (same); *Williams v. Filson*, 908 F.3d 546, 572 (9th Cir. 2018)

3    (quoting *Dickens*, 740 F.3d at 1318-19, with internal citation and parenthetical omitted);

4    *Ramirez*, 937 F.3d at 1248. When a petitioner has established both cause and prejudice to excuse

5    the procedural default of his claim, he no longer requires evidentiary development to support

6    establishing cause and prejudice under *Martinez*, but, he is "entitled to evidentiary development

7    to litigate the merits of his ineffective assistance of trial counsel claim, as he was precluded from

8    such development because of his post-conviction counsel's ineffective representation."

9          Mr. Abdulle contends that this Court may determine the issue without an evidentiary

10    hearing because the record clearly shows that his counsel had no legitimate tactical reason for

11    failing to object. *See e.g.*, *Zapata v. Vasquez*, 788 F.3d 1106 (9th Cir. 2015). However, if this

12    Court does not reach the merits of his IAC claim, Mr. Abdulle contends he is entitled to an

13    evidentiary hearing as his allegations amount to a colorable claim. *See Insyxiengmay v. Morgan*,

14    403 F.3d 657, 670 (9th Cir. 2005) (citation omitted) (reversing denial of evidentiary hearing) (If

15    a material fact is in dispute, an evidentiary hearing is required whenever petitioner's assertions,

16    "if proved, would entitle him to relief." "The petitioner's allegations need only amount to a

17    colorable claim" for a hearing to be required.)

18          The undersigned agrees that the Court may determine the issue without an evidentiary

19    hearing because the record shows that, while his counsel had no legitimate tactical reason for

20    failing to object, that failure did not result in prejudice to Mr. Abdulle.

21          3.    *Strickland* Analysis

22          Under *Strickland*, a petitioner must prove that counsel's performance fell below an

23    objective standard of reasonableness and that the deficiency prejudiced the petitioner.

REPORT AND RECOMMENDATION- 19

1              (a)     <u>Deficient Performance</u>

2         An objective standard of reasonableness is measured by the "prevailing professional

3    norms" at the time of representation. 466 U.S. at 688, 104 S.Ct. 2052. The inquiry of counsel's

4    performance under *Strickland* is "highly deferential," the court "must indulge a strong

5    presumption that counsel's conduct falls within the wide range of reasonable professional

6    assistance," and "the defendant must overcome the presumption that, under the circumstances,

7    the challenged action might be considered sound trial strategy." *Id*. at 689, 104 S.Ct. 2052

8    (quotations omitted). However, "courts may not indulge post hoc rationalization for counsel's

9    decision-making that contradicts the available evidence of counsel's actions." *Harrington v.*

10   *Richter*, 562 U.S. 86, 108, 131 S.Ct. 770 (2011) (internal quotation marks omitted); *see also*

11   *Wiggins v. Smith*, 539 U.S. 510, 526–27, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (rejecting a

12   state court's attempt to rationalize counsel's limited investigation into mitigating evidence as a

13   strategic decision when available evidence suggested counsel's conduct stemmed from

14   "inattention, not reasoned strategic judgment").

15        A counsel's failure to object to testimony on hearsay grounds is not ineffective where

16   the objection would have been properly overruled. *See Matylinsky v. Budge*, 577 F.3d 1083,

17   1094 (9th Cir.2009), *cert. denied*, 588 U.S.1154 (2010); *Rupe v. Wood*, 93 F.3d 1434, 1445

18   (9th Cir.1996) ("the failure to take a futile action can never be deficient performance"). Mr.

19   Abdulle contends that because BI's out-of-court statements to Detective Washington are

20   hearsay, they could only have been admissible to impeach her and thus, had his trial counsel

21   raised an objection and asked that the jury be instructed to consider the evidence for that

22   limited purpose only, it would have been sustained. The State argues that any hearsay

23   objection would have been futile and overruled because (1) the state may impeach its own

REPORT AND RECOMMENDATION- 20

witness and (2) the transcript of Detective Washington's interview with BI was properly

used to refresh her memory.

Mr. Abdulle points out that, prior to the time his counsel should have objected, BI had

testified that she was already prostituting before she met Mr. Abdulle, he never set up any

prostitution dates for her, he gave her one phone number (which she called to "get money from

[the person called] to have sex); that was the only time Mr. Abdulle gave her a number to call,

she made $200 but did not give any of that money to Mr. Abdulle, and she never paid Mr.

Abdulle any money for staying in his apartment. Dkt. 19, Ex. 20 at 605, 613, 618-619; 622-625;

627-629.

Mr. Abdulle contends the State then improperly elicited the following additional

testimony from BI through the transcript of her interview with Detective Washington, which

came in as substantive evidence of his guilt because his counsel failed to request a limiting

instruction: she had four to five dates, not just one; Mr. Abdulle sold her phone and kept the

money (about $100); she gave Mr. Abdulle another $100 in cash for "gas money and stuff"; and

Mr. Abdulle left after dropping her off for dates. Dkt. 19, Ex. 20 at 651-655.

It is helpful to put the foregoing into context. After BI testified that Mr. Abdulle provided

her with a telephone number, which she called to set up a time to "get money from him to have

sex…", BI testified that beyond that one time, there was never a time Derrick would take her to

meet anybody else. Dkt. 13-2 at 625. She then testified that she did not remember "what name

[she] set [Derrick] under [her] phone as." *Id.* at 638. The prosecutor then asked BI if she recalled

meeting with Detective Washington, whether she had talked to the detective about Mr. Abdulle,

if the meeting was recorded, and if she had reviewed the recorded interview. *Id.* at 638-642. At

this point, Mr. Peale raised the possibility "that the ensuing impeachment attempt" could

REPORT AND RECOMMENDATION- 21

implicate BI's Fifth Amendment rights. *Id.* at 642. Following the discussion about immunity, the prosecutor told the court that with regard to the issue of impeachment:

> [A]ctually she has indicated on a couple of responses that she didn't remember certain details. She hasn't had a chance to respond to that, whether or not looking at her statement refreshes her memory about those details she did not remember.
>
> We also don't know what her response is if I confront her with a statement she made previously. She may recall making that statement.
>
> . . . .
>
> [W]e're talking about potentially inconsistent statements, and nothing more than that, based on her statements from a prior interview. And I have not yet even confronted about her about it yet. Again, these are some of the responses that she gave earlier is that she did not know or didn't remember a detail, which is why I was going to be talking about the interview she did with Detective Washington.

Dkt. 19, Ex. 20, at 646-647. Thus, at this time, defense counsel knew that the prosecutor would be using the interview transcript to refresh BI's recollection and/or to impeach her with inconsistent statements, but he did not object on that basis at that time or during the following direct examination:

> Q.    … do you recall telling Detective Washington, that you in fact had about four to five dates and not just one?
>
> A.    Yeah, like a few more, yeah.
>
> Q.    Okay. So do you remember saying there was a few more than the one that you told us about today?
>
> A.    Yeah.
>
> Q.    And is there a particular reason why you told us only one today?
>
> A.    I just didn't really recall.
>
> Q.    Okay. You said that you skimmed through the interview; is that correct?
>
> …

REPORT AND RECOMMENDATION- 22

Q.    Okay. Do you remember talking with the detective about how much money you gave to Derrick during that interview?

A.    Yes.

Q.    What do you remember telling –

A.    Well, I didn't give him any money, but I had this phone and he sold it and kept the money. So if that's what you're talking about?

…

A.    I had a phone and he sold it and kept the money. And it was only about $100. But other than that I didn't pay him to live there.

Q.    Do you recall telling the detective that when you were staying with Derrick, that you actually gave Derrick barely $200?

A.    Yes.

Q.    And that would be in addition was that in addition to the phone that you just told us about?

A.    No.

Q.    So the phone, how much was that worth?

A.    Like $100.

Q.    Okay. So that would be about 100 of the 200?

A.    Yes.

Q.    And the other 100 that you gave Derrick, was that in cash?

A.    Like in gas money and stuff.

Q.    Okay. Gas money?

A.    Uh-huh.

Q.    And was the gas money because he took you to some of these dates?

A.    No, but we did drive around.

Q.    Okay. Do you remember talking to Detective Washington, about whether you

REPORT AND RECOMMENDATION- 23

1     were ever driven by Derrick, whether Derrick stayed or whether Derrick left do
2     you remember that at all?

A.    Can you repeat the question, please?

3

Q.    Yeah. When you were talking with Detective Washington that day, do you
4     remember him asking you if Derrick had ever stayed after he dropped you off or
     he left after he dropped you off? Do you remember talking about that with
5     Detective Washington?

6     A.    No, I don't really remember.

7     Q:    Okay, would looking at the transcript of that interview help refresh your memory
     about the conversation?
8

9     A:    I guess.

Q:    Okay.
10

. . . .
11

Q:    [I]'d like to have you look at page 60 around the middle of the page. Can
12    you see the lines that says Washington, or [I], your last name?

13    A:    Uh-huh

14    Q:    [J]ust go ahead and read the next few lines that you see after that. And
     then just look up whenever you're ready?
15

16    A:    It says –

17    Q:    No, without – reading it to yourself?

A:    Oh
18

Q:    Go ahead and read it to yourself and let me know if that refreshes your
19    memory. All right, did you read the next few sentences after that?

20    A:    Yes.

21    Q:    And after reading it now do you remember the detective asking you if
     Derrick ever left or stayed after he dropped you off?
22

A:    He'd leave
23

Q:    What was that?

REPORT AND RECOMMENDATION- 24

A:     He'd leave.

Q:     He'd leave? So did in fact Derrick ever drop you off or take you to a date?

A:     Probably like one or two times.

Q:     Probably like one or two times?

A:     Uh-huh.

. . . .

Q:     [Y]ou said 100 of the 200, barely 200, 100 was the phone, the other 100
       was cash. Was any of that money that you had earned at some point from
       one of those few more dates that you remember having?

A:     Yes.

Q:     And what was your understanding of where that money was going, did
       you ever ask?

A:     Gas and stuff.

Dkt. 19-1, Ex. 20 at 651-656. The prosecutor also refreshed BI's recollection with the interview

transcript as to the cell phone number she used during the time she was living with Mr. Abdulle.

*Id.*, Ex. 20 at 657.

(i)     <u>Failure to Object to Impeachment Was Not Deficient Performance</u>

Washington's Rule of Evidence 607 provides that "[t]he credibility of a witness may be

attacked by any party, including the party calling him." While the State may impeach its own

witness, it may not call a witness for the primary purpose of eliciting testimony to impeach the

witness with testimony that would be otherwise inadmissible. *State v. Lavaris*, 106 Wash.2d 340,

721 P.2d 515 (1986) (citing *State v. Barber*, 38 Wash.App. 758, 689 P.2d 1099 (1984)). In

*Lavaris*, the court affirmed the defendant's conviction because it found that impeachment was

not the State's primary purpose in calling the witness. *Lavaris*, 106 Wash.2d at 346, 721 P.2d

REPORT AND RECOMMENDATION- 25

515. Impeachment evidence affects the witness's credibility but is not probative of the substantive facts encompassed by the evidence. *State v. Johnson*, 40 Wash.App. 371, 377, 699 P.2d 221 (1985).

Here, the record demonstrates that in his direct examination of BI, the prosecutor attempted to elicit matters that were probative, proper, and admissible and that, before he confronted her with her prior inconsistent statements, he asked appropriate leading questions directed to her contact with Mr. Abdulle and his involvement in her dates. There is nothing in the record to indicate there was a reason to anticipate she would not testify consistently with her earlier statements until she was asked why she did not testify earlier that there was more than one date and she indicated she "just didn't recall," that she had only skimmed her prior statement, and that she had not thought about the case and "it kind of just left my mind because I have other things to think about." Dkt. 19, Ex. 20 at 651-652.

As previously noted, Mr. Peale does not recall his state of mind or whether he had a tactical reason for not objecting or if he instead, simply failed to think of raising the objection. Dkt. 13-4 at 2. The Court is mindful that just because counsel would do something different today, is not dispositive of the issue as the Court cannot employ 20-20 hindsight and *Strickland* recognizes there are countless ways to try a case. *See Brown v. Ornoski*, 503 F.3d 1006, 1013 (9th Cir. 2007). Moreover, a decision not to request a limiting instruction is "solidly within the acceptable range of strategic tactics employed by trial lawyers in the mitigation of damning evidence." In fact, a decision not to request a limiting instruction could be a reasonable trial strategy because trial counsel did not want to draw the jury's attention to BI's inconsistent statements. *See, e,g*., *Musladin v. Lamarque,* 555 F.3d 830, 846 (9th Cir. 2009) (citing *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir.1996)).

Defense counsel was aware that the prosecutor might attempt to impeach BI and for whatever reason, chose not to object. However, defense counsel effectively cross-examined BI and elicited testimony that she was not under oath when she spoke to Detective Washington and she did not always feel it necessary to tell the truth when she is on the streets. Dkt. 19, Ex. 20 at 675. Defense counsel also used inconsistencies in BI's testimony during closing arguments as evidence of weakness in the State's case and he argued that BI "created out of whole cloth a story" to protect another individual who was her pimp. Dkt. 19, Ex. 26 at 1608-1611.

Thus, the undersigned concludes that the failure to request the limiting instruction was not ineffective assistance. Even if the more prudent course would have been for counsel to request the limiting instruction, Mr. Abdulle has failed to show prejudice (discussed in (b) below).

(ii)    <u>Failure to Object to Use of Transcript to Refresh Recollection Was Not Ineffective Assistance</u>

The criteria for refreshing a witness's recollection are (1) the witness's memory needs refreshing, (2) opposing counsel has the right to examine the writing, and (3) the trial court is satisfied that the witness is not being coached, *i.e.*, "the witness is using the notes to aid, and not to supplant, his own memory." *State v. Little*, 57 Wash.2d 516, 358 P.2d 120 (Wash. 1961). Ultimately, the witness still must testify to "his own memory," and not simply parrot what is contained in the document used supposedly to refresh recollection. *Columbia State Bank v. Invicta Law Grp. PLLC*, 402 P.3d 330, 342 (Wash. Ct. App. 2017) (quoting *State v. Little*, 57 Wash.2d at 516, 358 P.2d at 122 (Wash. 1961)) (The witness's "testimony is the evidence, the writing is not.")

Here, the criteria for refreshing the witness's recollection were met. When BI testified that should could not remember, counsel had her examine the interview transcript and BI then

testified to her refreshed memory. Counsel for Mr. Abdulle had the opportunity to review the document and cross-examine BI. For example, BI testified on cross-examination, that the phone and money she gave Mr. Abdulle was not because she had prostituted and was giving him a cut; when Mr. Abdulle gave her that one number, he didn't suggest it was to have sex, and the decision to have sex with that man was something she and that man decided on their own. Dkt. 19, Ex. 20 at 684-685; 687.  BI testified to having multiple "dates" during the period she stayed with Mr. Abdulle, but she also testified that she was certain that Mr. Abdulle "did not know [she was] going to have sex with" her dates. *Id*. at 658, 721.

A review of the transcript reveals that the prosecutor's use of BI's prior statement to refresh her memory was neither improper nor objectionable, as the prosecutor first asked if reviewing the prior statement would refresh her memory and then showed her the statement after she answered in the affirmative. Thus, the undersigned concludes that counsel did not render ineffective assistance of counsel when he did not object on this basis.

b.    Prejudice

In determining whether a petitioner suffered prejudice, the Court must ask "whether there is a reasonable probability that, absent the errors [by counsel], the factfinder would have had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. A reasonable probability is "sufficient to undermine confidence in the outcome" and must be substantial, not just conceivable. *Id*. at 693–94, 104 S.Ct. 2052. This standard does not mean a petitioner must demonstrate "that counsel's actions more likely than not altered the outcome." *Harrington*, 562 U.S. at 112, 131 S.Ct. 770 (citing *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052) (internal quotation marks omitted). In fact, denying a *Strickland* claim on the grounds of failure to show prejudice by a preponderance would not only be wrong, "that decision would be 'diametrically different,'

'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent[.]" *Williams v. Taylor*, 529 U.S. 362, 406 (2000); *Accord*, *Hardy v. Chappell*, 849 F.3d 803, 818 (9th Cir. 2016) (citing *Williams*).

Mr. Abdulle identifies the following evidence as having been improperly obtained and requiring an instruction limiting the jury's use of such evidence to impeachment and not substantive evidence of guilt: (1) BI had four to five dates, not just one; (2) Mr. Abdulle sold her phone and kept the money (about $100); (3) she gave Mr. Abdulle another $100 in cash for "gas money and stuff"; and (4) Mr. Abdulle left after dropping her off for dates. Dkt. 19, Ex. 20 at 651-655.

The undersigned concludes that Mr. Abdulle was not prejudiced by counsel's failure to raise an objection and request a limiting instruction as such an instruction would not have, as he suggests, kept out all of BI's testimony related to her interview with Detective Washington. As previously discussed, the bulk of BI's testimony was not simply what she told Detective Washington but was her testimony after she had been properly alerted to inconsistencies in her prior statement and/or after being refreshed with her prior statement.

In addition, even without BI's testimony recalling her prior statements, there was sufficient evidence that Mr. Abdulle promoted the commercial sexual abuse of BI. In that regard, Washington law provides, in relevant part:

> (1)    A person is guilty promoting commercial sexual abuse of a minor if he or she knowingly advances commercial sexual abuse or a sexually explicit act of a minor or profits from a minor engaged in sexual conduct or a sexually explicit act.

Wash. Rev. Code § 9.68A.101(1). Although the Washington Court of Appeals did not review the IAC claim at issue here, it did examine the evidence supporting Mr. Abdulle's conviction for promoting commercial sexual abuse of BI and determined that the jury's verdict was supported

by the record:

> The testimony at trial showed Abdulle gave BI a phone number and told her to call it and "see what goes." BI interpreted this as "make money." BI also testified that "Derrick" drove her to and from dates at least once or twice, and that she had given "Derrick" a cell phone and money that she earned from prostituting in order to cover his "gas expenses" for driving her to meet a client. Taken in the light most favorable to the State, B.l.'s testimony was sufficient for a rational trier of fact to find that Abdulle aided her commercial sexual abuse and profited from it.

Dkt. 19, Ex. 14 at 3–4. Mr. Abdulle argues that the Washington Court of Appeals relied on improperly admitted evidence in reaching this conclusion. However, after the prosecutor properly refreshed BI's testimony, she testified that Derrick left after he dropped her off to dates "probably like one or two times;" that $100 of the $200 that she gave Derrick was from one of the dates that she had; and it was her understanding that the money would be used for gas and stuff. Thus, this was not improperly admitted evidence.

In addition, Detective Washington testified to text messages exchanged between BI's phone and one of Mr. Abdulle's phones (Dkt. 19-1, Ex. 24 at 1256), and a series of text message between Mr. Abdulle's phone and a potential "jug" or "john" regarding an underaged girl, who would be turning 18 soon, who "will obey":[3]

> Q.    Did you see any other messages in that short report there, relating to BI Maybe not necessarily involving her number, but relating to BI?
>
> A:    I saw text messages where a person using the phone was talking with other individuals and they were referring to a girl, and they were referring to a girl that was under the age of 18 and went on to summarize or that word, kind of bragged that she was young and she would be turning 18 soon.
>
> . . . .
>
> A:    It said something to the effect of in July she'll turn 18.

---

[3] This corroborated BI's testimony that she told Mr. Abdulle she would turn 18 in July that year. BI was born in July of 1996 and met Mr. Abdulle, who introduced himself as "Derrick," in February of 2013, when BI was sixteen years old. Dkt. 19-1, Ex. 20 at 600, 609. When they met, BI lied about her age and stated that she was almost eighteen years old. *Id.*, Ex. 20 at 620).

REPORT AND RECOMMENDATION- 30

. . . .

A:    Next [sent] text message that follows is, you like her.

. . . .

A:    The next [incoming] message is … she's nice.

…

A.    Yes. And then the next [sent] message following that would be, she's young earner.

Q:    How about any outgoing messages in response to that?

A:    Then the next message outgoing the same series of conversation is, July she is 18.

. . . .

A:    The next message sent to the phone, she will obey.

. . . .

A:    The next message going out from the phone to the same person in the conversation is, you want I bring her?

. . . .

A:    The next was incoming message to the phone from the person they were in the conversation with that states tomorrow, what's fee.

Dkt. 19, Ex. 24 at 1256-1260.

Although BI claims that she worked independently, arranged her own dates, kept her earnings, and never paid rent (Dkt. 19-1, Ex. 20 at 629–30, 684), her admission that Mr. Abdulle gave her a telephone number, which she used to set up a prostitution date and from which she made money, is arguably in and of itself sufficient to satisfy the elements of Count 2. The additional evidence that Mr. Abdulle drove her to and from dates and that she gave him a cell phone and money that she earned from prostituting to cover "gas money" further supported the jury's verdict. Additionally, the testimony from Detective Washington established telephone

REPORT AND RECOMMENDATION- 31

calls and texts between Mr. Abdulle's telephone and BI's telephone and at least one telephone

call where Mr. Abdulle communicated with a potential "jug" or "john" regarding BI Although BI

attempted to minimize Mr. Abdulle's involvement in her prostitution activities, the jury was

capable of assessing her credibility, as it was instructed to do.

Because it is not likely that a limiting instruction would have changed the outcome

of the trial considering all the other evidence against Mr. Abdulle, the undersigned

recommends that the habeas petition be denied. *See Berghuis v. Thompkins*, 560 U.S. 370,

130 S.Ct. 2250, 2265, 176 L.Ed.2d 1098 (2010) (Even assuming counsel's failure to request

a limiting instruction was deficient representation, petitioner could not show prejudice

because "[t]he record establishe[d] that it was not reasonably likely that the instruction

would have made any difference in light of all the other evidence of guilt.").

<u>CONCLUSION</u>

Based on the foregoing, the undersigned recommends the Court deny the amended

habeas petition.

<u>CERTIFICATE OF APPEALABILITY</u>

If the district court adopts the Report and Recommendation, it must determine whether a

certificate of appealability ("COA") should issue. Rule 11(a), Rules Governing Section 2254

Cases in the United States District Courts ("The district court must issue or deny a certificate of

appealability when it enters a final order adverse to the applicant."). A COA may be issued only

where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28

U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason

could disagree with the district court's resolution of his constitutional claims or that jurists could

conclude the issues presented are adequate to deserve encouragement to proceed further."

REPORT AND RECOMMENDATION- 32

*Wilson-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The undersigned recommends that a COA be issued as reasonable jurists could debate whether he should be given an evidentiary hearing and/or whether he has shown ineffective assistance of counsel.

## CONCLUSION

The Court recommends **DENYING** Mr. Abdulle's habeas petition on the merits without an evidentiary hearing and **GRANTING** issuance of a certificate of appealability.

Any objections to this Recommendation must be filed and served upon all parties no later than **January 27, 2020**. The Clerk should note the matter for **January 29, 2020,** as ready for the District Judge's consideration if no objection is filed.  If objections are filed, any response is due within 14 days after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed twelve (12) pages.  The failure to timely object may affect the right to appeal.

DATED this 6th day of January, 2020.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION- 33